

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JANET WHALEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 08 C 4867 |
| v. | ) |
| | ) Judge Ruben Castillo |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Janet Whalen ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") terminating her disability benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 405(g). (R. 1, Compl.) Presently before the Court are the parties' cross-motions for summary judgment. (R. 15, Pl.'s Mot. for Summ. J.; R. 20, Defs.' Mot. for Summ. J.) For the reasons stated below, the Commissioner's motion is granted and the Plaintiff's motion is denied.

## RELEVANT FACTS

Plaintiff was born on August 30, 1961, and is a resident of Willowbrook, Illinois. (A.R. at 484.)[1] She has an eleventh grade education and has no vocational training. (A.R. at 484-85.) She previously worked as a data entry clerk, and then as a newspaper delivery person, but quit the newspaper job in 2000 due to depression and anxiety. (A.R. at 107, 485.) She filed for

---

[1] Citations to (R.___.) refer to the record number that a document is assigned on the docket sheet for this case. Citations to (A.R. ___.) refer to the administrative record of these proceedings, which was filed as entry number 12 on the docket.

1

disability benefits, and in April 2002, the SSA determined that she had become disabled as of November 15, 2000, based on a combination of impairments. (A.R. at 106-10.) During a periodic reevaluation of her case, the SSA determined that as of May 1, 2006, Plaintiff had experienced medical improvement and was no longer eligible for benefits. (A.R. at 11-17.) It is from this determination that Plaintiff seeks judicial review. (R. 1, Compl.)

## I. Medical Evidence

Plaintiff alleges that she suffers from depression, anxiety, panic disorders, nervousness, lower back pain, and carpal tunnel syndrome. (A.R. at 140-41.) Plaintiff claims that she has had anxiety problems most of her life, but they were first documented on April 30, 1990. (A.R. at 217.) On November 25, 1996, Plaintiff was diagnosed with bilateral carpal tunnel syndrome that was more severe on the right side. (A.R. at 239.) Plaintiff began treatment for her anxiety problems in 1997 with a therapist at the Fillmore Center for Human Services, but stopped treatment after two sessions. (A.R. at 190.)

On January 30, 2001, Plaintiff reported in a pain questionnaire that she suffered from pain in her hands, wrists, arms, and legs, which prohibited her from standing for long periods of time. (A.R. at 163-164.) In addition, Plaintiff responded in the Activities of Daily Living Questionnaire that she could not complete household chores for a sustained period of time and only interacted with others on a limited basis. (A.R. at 167.)

On February 20, 2001, Plaintiff underwent an electromyography ("EMG") at Hinsdale Hospital. The test revealed some acute signs of denervation in the tibialis anterior muscle, bilaterally, and the right gastrocnemius muscle in Plaintiff's back, but the paraspinal muscles were normal. (A.R. at 233.) The EMG also showed signs of possible acute L4 radiculopathy

2

lesion bilaterally and a loss of motor units and denervation, but no sign of generalized peripheral neuropathy disorder. (*Id.*) The same information was later confirmed by an internal medicine consultative examination by Dr. Shital Shah, which revealed pain in the lower back area that radiated to the bilateral legs. (A.R. at 240-44.) Dr. Shah noted that Plaintiff had been recommended for further testing but that she did not do so for financial reasons. (A.R. at 244.)

On February 26, 2001, Dr. Jesse Park diagnosed Plaintiff with panic disorder. (A.R. at 234.) This diagnosis was confirmed by Dr. John O'Donnell on April 5, 2001. (A.R. at 246.) Dr. David Gilliland reported in a May 8, 2001, psychiatric evaluation that Plaintiff had an anxiety disorder without significant mental limitations in adaptation and was capable of remembering and carrying out simple instructions and performing simple, repetitive tasks. (A.R. at 275.)

A daily activities telephone report completed by a registered nurse on August 10, 2001, found Plaintiff to suffer from frequent and severe panic attacks. (A.R. at 185.) In addition, the report noted that Plaintiff lacked energy and did not sleep well, but that her concentration and memory remained intact. (A.R. at 185.) On August 21, 2001, Dr. Robert England performed a Physical Residual Functional Capacity Assessment, which found Plaintiff to have the ability to perform light work. (A.R. at 305.) In a consultation at Medical Neurology Associates, Dr. H.G. Frank found that the majority of Plaintiff's symptoms were related to psychiatric and situational issues associated with her marital and financial problems, and secondly to spondylosis[2] in her lower back. (A.R. at 307.)

On February 22, 2006, Dr. Herman P. Langer performed a psychiatric examination in

---

[2] Spondylosis is the immobility and consolidation of a vertebral joint due to a disease, injury or surgical procedure. *Dorland's Medical Dictionary* at 19, 1684.

3

which he found Plaintiff to be oriented in time, place, person, and in contact with reality. (A.R. at 412-15.) Dr. Langer reported that Plaintiff's speech was coherent and understandable and her memory was intact. (*Id.*) Although Plaintiff appeared anxious, he did not find any difficulty with attention span or concentration, and no signs of auditory or visual hallucinations. (*Id.*)

The following month Dr. James Beckett performed a lumbar spine study, which found Plaintiff to have a minimal anterior degenerative spondylosis. (A.R. at 420.) On March 29, 2006, psychologist Dr. Tyrone Hollerauer conducted a Mental Residual Functional Capacity assessment and found Plaintiff to be anxious but cooperative and noted that she appeared alert, coherent, and well-groomed. (A.R. at 423.) Notes from Plaintiff's mental status examination concluded that she was not exhibiting signs of being "significantly/severely" impaired and that there had been psychological improvement. (A.R. at 423.) In May 2006, psychologist Dr. Larry Kravitz reported that Plaintiff had experienced medical improvement and was capable of performing simple, routine work-related tasks. (A.R. at 443-445.)

In April 2007, Dr. L.M. Hudspeth, a psychologist, conducted a Mental Residual Functional Capacity Assessment and noted that Plaintiff was able to perform all typical tasks involved in maintaining her household. (A.R. at 448.) Dr. Hudspeth's report also indicated that Plaintiff retained the mental capacity to understand, remember, and carry out basic demands of simple unskilled work that involved limited interaction with the general public and co-workers. (*Id.*) Dr. Hudspeth noted that Plaintiff was not currently receiving any psychiatric treatment and was not taking any prescribed psychotropic medications. (*Id.*)

On October 2, 2007, Plaintiff began seeing psychologist Dr. Lisa Pinto. (A.R. at 474.) Dr. Pinto diagnosed Plaintiff with depression and a panic disorder. (A.R. at 474-75.) Dr. Pinto's

treatment notes from October 2007 to January 2008 indicate that Plaintiff continued to exhibit signs of anxiety and that she was prescribed medication for her condition. (A.R. at 474-75.)

## II.     The ALJ Hearing

On January 14, 2008, Plaintiff appeared with her counsel and testified at a hearing before Administrative Law Judge ("ALJ") Dennis Greene in Oak Brook, Illinois. (A.R. at 478-541.) At the hearing, Plaintiff testified that she suffers from anxiety and panic disorders, which cause her to lose concentration and feel flustered, making it difficult for her to be around people. (A.R. at 488.) She described her panic attack symptoms as feeling fearful and agitated, with difficulty speaking, and a loss of concentration. (A.R. at 491.) She stated that her anxiety attacks occur on a daily basis but that talking to herself or counting can relieve them. (A.R. at 496-99.)

Plaintiff testified that she began seeing Dr. Pinto in October 2007 but had not otherwise received medical treatment for her condition since approximately 2002. (A.R. at 489.) She stated that she has not consistently been on medication because of the side effects. (*Id.*) She stated that she used Paxil for approximately eight months sometime around 2002, but experienced side effects, including fatigue, dry mouth, and loss of concentration. (A.R. at 489-90.) Plaintiff testified that she began taking Zoloft for her condition shortly before the hearing. (A.R. at 490, 495.)

Regarding her daily activities, Plaintiff testified that she drives her teenage son to and from school and drives to the store, but stated that she is very dependent on her adult daughter, Marianne Gantner ("Gantner"), for assistance with daily activities. (A.R. at 497.) Her last year of full-time employment was in 2000 when she drove a newspaper delivery truck and carried approximately 30 pounds of newspapers at a time. (A. R. at 486-87.) Plaintiff testified that she

quit because of her depression and panic attacks. (*Id.*)

Plaintiff's daughter, Gantner, testified that she sees her mother every weekend and once or twice a month on the weekdays. (A.R. at 501.) Gantner stated that her mother's condition has not changed since 2002. (A.R. at 502.) The ALJ asked Gantner to describe her mother's condition, to which she responded that Plaintiff has both physical and emotional problems, including experiencing "red face, red neck, flushing . . . [and] not being able to focus." (A.R. at 502, 508.) Gantner testified that her mother easily gets stressed and fearful and that she must assist her mother with every day simple tasks, such as calling the doctor. (A.R. at 506.)

The ALJ asked Gantner about Plaintiff not receiving treatment from a doctor, to which Gantner responded that she was aware that her mother temporarily stopped receiving payments and that her Medicaid had been terminated for some period. (A.R. at 508.) Gantner described Plaintiff's attempt to control her anxiety through a "kit" she ordered that "tries to teach you cognitive therapy" and "positive thinking." (A.R. at 510.) Gantner then testified about Plaintiff's employment and stated that Plaintiff suffered from a panic attack during an interview for a position in the Jewel deli department and has trouble interacting with others. (*Id.*) Gantner also informed the ALJ that Plaintiff has no social life or hobbies and mostly stays in the house, although she occasionally goes out to eat with Gantner and her children. (A.R. at 513.)

The medical expert, Dr. Kathleen O'Brien, a licensed clinical psychologist who is board-certified in forensic psychology, testified about Plaintiff's medical history. Dr. O'Brien stated that she found very little evidence of psychiatric treatment until October 2007. (A.R. at 514-16.) During the hearing, it was discovered that Dr. O'Brien had not been given all of the documents from Plaintiff's 2002 hearing to review. (A.R. at 515.) Approximately 31 pages of documents

were provided to Dr. O'Brien at the hearing, and the ALJ went off the record to give her an opportunity to review them. (A.R. at 516.) After they went back on the record, Dr. O'Brien indicated that she had reviewed the records. (*Id.*) She noted that Plaintiff had some treatment around 2001 and then nothing until October 2007, a couple of weeks prior to the hearing. (A.R. at 517.) Dr. O'Brien also noted that Plaintiff had started taking Zoloft and Ativan approximately one week before the hearing. (A.R. at 517, 524.)

The ALJ asked Dr. O'Brien whether there was any showing of medical improvement. (A.R. at 517.) Dr. O'Brien testified that a panic disorder is a "very uncomfortable illness" but is "highly treatable" through medication and therapy. (*Id.*) Dr. O'Brien also reviewed Dr. Pinto's notes and found that their therapy sessions tended to focus on "family dynamics" and "unhappiness," although she noted that Plaintiff reported a lot of anxiety. (*Id.*) Dr. O'Brien found no evidence in the medical record that Plaintiff meets or equals a listed impairment, and based on the consultative exams she opined that Plaintiff had experienced medical improvement. (A.R. at 518.) Dr. O'Brien testified that Plaintiff could perform unskilled work that involved limited social contact. (*Id.*)

A vocational expert, Glee Ann Kehr ("Kehr"), also testified. (A.R. at 531-40.) Kehr evaluated Plaintiff's prior work experience and was then asked by the ALJ to consider a hypothetical where an individual with Plaintiff's age, education and work history could occasionally lift 50 pounds, 20 pounds frequently, stand and walk six of eight hours, sitting six of eight hours, and occasionally climb, kneel and crouch. (A.R. at 534.) Kehr testified that such an individual could perform work in the medium, light, and sedentary categories, which would include Plaintiff's past work experience and other work performed in the economy. (A.R. at

7

534-35.) She identified a number of jobs within these levels including production helper, packaging, office helper, housekeeping, machine feeder and press operator. (A.R. at 535-36.) The ALJ then asked Kehr what jobs involved simple, unskilled work with no social contact. (A.R. at 536.) Kehr stated that certain jobs in the manufacturing setting or in housekeeping would fit these requirements. (*Id.*) Kehr testified that the individual would need to be able to maintain focus and concentration without having to leave her job site or work station. (A.R. at 537.) She testified that "an individual who is unable to go out independently and stay in social situations . . . without . . . crying and needing to leave the room, things like that . . . would not be able to sustain employment . . . ." (A.R. at 537.)

### III. The ALJ's Decision

Following the hearing, the ALJ issued a written opinion finding that Plaintiff was no longer disabled as of May 1, 2006. (A.R. at 18-17.) He determined that the most recent favorable decision finding her disabled was dated April 23, 2002, such that this was the comparison point for his analysis. (A.R. at 12.) The ALJ determined that Plaintiff had one severe impairment, "anxiety related disorders," but that Plaintiff's other impairments, including hypothyroidism, obesity, carpal tunnel syndrome, lumbar sciatica, osteoarthritis of the lumbar spine, left chest inflammation, and irregular heartbeat could not be considered severe impairments. (A.R. at 13.) The ALJ further concluded that Plaintiff's impairments do not meet or medically equal the severity of the impairments listed in 20 C.F.R. part 404, Subpart P, Appendix I. (*Id.*)

The ALJ then concluded that Plaintiff had experienced medical improvement and had the residual functional capacity to perform work in the national economy. (A.R. at 13.) In reaching

8

this determination, the ALJ gave "substantial weight" to the opinions of the numerous Disability Determination Services ("DDS") medical consultants, which he found "consistent with the record." (A.R. at 15.) The ALJ considered Dr. Hudspeth's opinion that Plaintiff was able to perform the typical tasks involved in maintaining her household and that her adaptive capacities remained intact. (A.R. at 14.) The ALJ also considered Dr. Hollerauer's psychiatric evaluation, which indicated that Plaintiff demonstrated medical improvement and that she was able to perform a wide-range of unskilled work. (A.R. at 15.) He also considered Dr. Langner's report that Plaintiff was cooperative and coherent, with her memory intact and showing no difficulty with attention span or concentration. (A.R. at 14.) The ALJ concluded that Plaintiff's medical impairment "could have reasonably been expected to produce the alleged symptoms," but that her statements concerning the "intensity, persistence and limiting effects of her symptoms are not entirely credible." (A.R. at 15.) Based on the medical evidence and the testimony of the vocational expert, the ALJ concluded that Plaintiff could perform work in the national economy, and that she was ineligible for benefits as of May 1, 2006. (A.R. at 11, 16-17.)

On June 27, 2008, the Appeals Council denied Plaintiff's request for review. (A.R. at 4.) Plaintiff thereafter filed this action seeking judicial review of the agency's decision terminating her benefits. (R.1, Compl.)

## LEGAL STANDARDS

In reviewing the ALJ's decision, this Court determines whether it is supported by substantial evidence and based on the proper legal criteria.[3] *Villano v. Astrue*, 556 F.3d 558, 562

---

[3] Where, as here, the Appeals Council denies review, the ALJ's decision constitutes the final decision of the Commissioner that is subject to judicial review. *Villano*, 556 F.3d at 561-62.

9

(7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Although this standard is generous, it is not entirely uncritical." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). In reviewing the ALJ's conclusions, "[t]he court will conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). The ALJ is not required to discuss every piece of evidence, but must explain his analysis with "enough detail and clarity to permit meaningful appellate review" and must also build a "logical bridge" from the evidence to his conclusion. *Villano*, 556 F.3d at 562. In reviewing the ALJ's decision, the Court cannot "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Further, the Court gives the ALJ's opinion "a commonsensical reading rather than nitpicking at it." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

## ANALYSIS

A claimant is qualified to receive Social Security disability benefits if found to be disabled within the meaning of the Act. 42.U.S.C. § 423(a)(1)(E); *Briscoe*, 425 F.3d at 351. A disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 219-220 (2002).

10

To determine whether a claimant qualifies for disability benefits, the ALJ performs a five-step sequential analysis, deciding: (1) whether the claimant is involved in gainful activity; (2) whether she has a severe impairment or impairments; (3) whether her impairment or combination of impairments meets or equals a listed impairment contained in the Social Security regulations; (4) whether the claimant's impairments prevent her from doing her past relevant work; and (5) whether other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors. 20 C.F.R. § 416.920; *Craft*, 539 F.3d at 674. An affirmative answer at steps one, two, or four leads to the next step, while an affirmative answer at either step three or step five requires a finding of disability. *Briscoe*, 425 F.3d at 352. The claimant bears the burden of proof at steps one through four, and the burden shifts to the Commissioner at step five. *Id.*

According to SSA regulations, once the agency determines that a person is disabled, it must evaluate the claimant's impairments "from time to time to determine if [the claimant is] still eligible for disability cash benefits." 20 C.F.R. § 404.1589; *see also Johnson v. Apfel*, 191 F.3d 770, 773 (7th Cir. 1999). The agency refers to this evaluation as a "continuing disability review." *Johnson*, 191 F.3d at 773. In evaluating the claimant's continued eligibility for benefits, the agency must consider whether "there has been any medical improvement in [the claimant's] impairment(s) and, if so, whether this medical improvement is related to [the claimant's] ability to work." 20 C.F.R. § 404.1594(a); *Johnson*, 191 F.3d at 773. Medical improvement means "any decrease in medical severity of the impairment(s) present at the time of the most recent favorable medical decision" finding the claimant disabled, as demonstrated by "improvement in symptoms, signs, and/or laboratory findings." 20 C.F.R. § 404.1594(b)(1). If a

claimant is found to have experienced medical improvement such that she is able to perform her past relevant work or some other work that exists in the economy, she is no longer eligible for benefits. 20 C.F.R. § 404.1594(f); *Johnson*, 191 F.3d at 773. Here, the ALJ concluded that, based on the medical evidence, Plaintiff had experienced medical improvement in her anxiety disorder and was capable of performing work that exists in the national economy. (A.R. at 11-18.)

## I. Listed Impairments

Plaintiff first argues that she meets the requirements of a listed impairment and that the ALJ failed to consider the record as a whole when reaching his decision on this issue. (R. 16, Pl.'s Mem. at 9-13.) Specifically, Plaintiff argues that she meets the listing for 12.06 anxiety disorders and that she meets at least two of the four following requirements: marked restriction of activities of daily living and marked difficulties in maintaining social functioning. (*Id.* at 9-10.) Plaintiff further contends that she satisfies the third requirement of marked difficulties in maintaining concentration, persistence or pace. (*Id.*)

Under the Social Security regulations, a claimant is eligible for disability benefits if she has an impairment or combination of impairments which meet or equal an impairment found in the Listing of Impairments. 20 C.F.R. §§ 404.1520(d), 415.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. I. A claimant seeking disability benefits bears the burden of proving that her condition meets or equals a listed impairment. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). In conducting a listing analysis, the ALJ should mention the specific listing or listings he is considering, and his failure to do so, if combined with a perfunctory analysis, may require a remand. *Ribaudo*, 458 F.3d at 583; *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). The

ALJ commits reversible error if he fails to discuss a specific listing or provide a thorough analysis if there is conflicting evidence about whether the claimant meets a specific Listing. *Rice*, 384 F. 3d at 370.

Here, the ALJ concluded: "Since May 1, 2006, the claimant did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix I (20 CFR 404,1594(b)(1))." (A.R. at 13.) Although his analysis was cursory, little more needed to be said given that there was no conflicting evidence about whether Plaintiff met or equaled a listing. Several medical professionals who evaluated Plaintiff concluded that she did not meet or equal a listing (*see* A.R. at 107, 425-72), and no doctor has opined that Plaintiff met or equaled a listing.[4] Accordingly, the Court finds the ALJ's determination supported by substantial evidence.

## II. Residual Functional Capacity

Plaintiff next challenges the ALJ's residual functional capacity determination. (R. 16, Pl.'s Mem. at 13-14.) "Residual functional capacity is that which a claimant can still do despite her physical and mental limitation . . . . The ALJ considers the claimant's ability to lift weight, sit-stand, walk, push-pull, etc., in reaching this determination . . . The claimant's residual functional capacity is used to determine her ability to engage in various levels of work (sedentary, light, medium, heavy, or very heavy)." *Clifford v. Apfel*, 227 F.3d 863, 873 n.7 (7th

---

[4] The Court notes that even when Plaintiff was originally found to be eligible for benefits, it was not on the basis of meeting a listing. In the original benefits determination, the ALJ relied heavily on the testimony of the medical expert, Dr. David L. Biscardi, who opined that Plaintiff did not meet or equal a listing, but that her frequent panic attacks precluded her from concentrating on work-related activity for any significant period. (A.R. at 107.) Dr. Biscardi further opined that through treatment and "income from her disability," Plaintiff's condition could be alleviated. (A.R. at 110.)

13

Cir. 2000) (internal citations omitted); *see also* 20 C.F.R. § 404.1545. When determining the claimant's residual functional capacity, the ALJ must consider all medically determinable impairments, including those that are not considered severe. *Craft*, 539 F.3d at 676. This also includes mental limitations because a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressure in a work setting, may reduce [a claimant's] ability to do past work and other work." 20 C.F.R. § 404.1545(c); *see also Craft*, 539 F.3d at 676.

Here, the ALJ thoroughly considered the evidence in assessing Plaintiff's residual functional capacity. The ALJ considered the information contained in the consulting examinations, which found Plaintiff to be coherent and also indicated that she had the ability to understand and carry out simple tasks. (A.R. at 14, 66, 423, 443-45, 448.) Despite Plaintiff's complaints, the medical consultants found only mild or moderate limitations in daily activities, social functioning, and maintaining concentration, persistence, and pace. (A.R. at 15, 425-72.) After considering the medical evidence and the testimony of the vocational expert, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy as of May 1, 2006. (A.R. at 11.)

Plaintiff argues that the ALJ erred in failing to consider a January 8, 2008, letter from Dr. Pinto indicating that she is not able to work because of her "incapacitating psychological issues." (R. 16, Pl.'s Mem. at 6-7; *id.*, Attachment.) Plaintiff's counsel claims he submitted this letter to the agency on January 10, 2008, but for unknown reasons it was not made part of the record. (*Id.* at 6.) The record does not indicate whether this document was ever received by the agency, nor

14

does it explain why, if it was received, it was not made part of Plaintiff's file. At the hearing before the ALJ, Plaintiff's attorney reviewed the material contained in Plaintiff's administrative file and indicated that he had "no objections to the evidence," but it is not known if this letter was part of the file at that time.[5] (A.R. at 482-83.) Assuming the agency improperly failed to include this document in Plaintiff's file, any such error was harmless. Dr. Pinto did not begin treating Plaintiff until October 2007, which was more than a year after Plaintiff was found to have experienced medical improvement. The January 2008 letter from Dr. Pinto did not express any opinion about the severity of Plaintiff's condition as of May 1, 2006, and thus would have been of limited relevance to the ALJ's analysis.[6] *See generally Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008) (evidence not material where it addressed claimant's current condition rather than his condition during time period under consideration by ALJ); *Schmidt v. Barnhart*, 395 F.3d 737, 741-42 (7th Cir. 2005) (evidence material only where it pertains to claimant's condition during time period under review). Moreover, the report was cumulative of other evidence from Dr. Pinto that was in the record, including notes of her January 8, 2008, visit with Plaintiff. (A.R. at 474-75.) Therefore, the Court does not find a remand necessary on this ground.

---

[5] Plaintiff's counsel states that he did not object to the exhibits of record because it was "his belief that Dr. Pinto's report was in fact submitted and received by the administration . . . ." (R. 22, Pl.'s Reply at 2.)

[6] The Court notes, moreover, that the ALJ need not give controlling weight to a treating physician's opinion unless that opinion "is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870. In other words, "a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001.)

15

Plaintiff also contends that the ALJ erred in relying on Dr. O'Brien's testimony because Dr. O'Brien did not fully consider the medical evidence prior to the hearing. (R. 16, Pl.'s Mem. at 7-9.) During the hearing, it was discovered that Dr. O'Brien had not received the entire file from Plaintiff's 2002 hearing. (A.R. at 515.) These documents (totaling approximately 31 pages) were provided to Dr. O'Brien at the hearing, and the ALJ went off the record to give her an opportunity to review them. (A.R. at 515-16.) After they went back on the record, Dr. O'Brien indicated that she had reviewed them but stated that "still there's very, very little in this record about any kind of psychiatric treatment." (A.R. at 516.) Plaintiff asserts that Dr. O'Brien inaccurately stated that there was no objective medical evidence showing that Plaintiff had been treated for a mental illness prior to October 2007. (R. 16, Pl.'s Mem. at 8-9.) When her testimony is read in context, however, it is apparent that Dr. O'Brien considered the evidence pertaining to Plaintiff's prior treatment for mental illness, but concluded that there had not been any such treatment for several years prior to 2007. (A.R. at 516-17.) After considering the additional medical records tendered to her during the hearing, Dr. O'Brien testified that "2001 is about the last time that she's had any treatment for this, for the panic disorder, until she picks it up again, as I said, in October of 2007, a couple of months ago." (A.R. at 517.) Plaintiff herself admitted at the hearing that she had not been under a doctor's care for her anxiety since approximately 2002, even though she sought medical care during this period for other health problems. (A.R. at 489.)

Plaintiff argues that Dr. O'Brien should have been given these documents prior to the hearing, and that her failure to review them beforehand "tainted" the entire hearing. (R. 16, Pl.'s Mem. at 9.) Assuming Plaintiff is correct that there was a procedural error, the Court can discern

16

no prejudice to Plaintiff. Dr. O'Brien was fully aware of the evidence pertaining to Plaintiff's earlier treatment for mental illness and considered it in reaching her opinions. (*See* A.R. at 516-18.) It is unclear, and Plaintiff has not explained, how Dr. O'Brien's opinions might have been different if she had been given more time to consider the medical records from 2002 and earlier, given that the issue before the ALJ was whether Plaintiff had experienced medical improvement as of May 2006. For all these reasons, the Court finds the ALJ's decision supported by substantial evidence.

## CONCLUSION

The Commissioner's motion for summary judgment (R. 20) is granted, and Plaintiff's motion for summary judgment (R. 15) is denied. Judgment is entered in favor of the Commissioner.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: June 30, 2009